## YELLOW CAB OPERATING CO. v. TAXI-CAB DRIVERS LOCAL UNION NO. 889 OF OKLAHOMA CITY, OKL., et al.

### No. 566.

District Court, W. D. Oklahoma.

Oct. 18, 1940.

J. B. Dudley, of Oklahoma City, Okl. (Dudley, Hyde, Duvall & Dudley, of Oklahoma City, Okl., of counsel), for plaintiff.

C. W. Schwoerke, of Oklahoma City, Okl., for defendants.

VAUGHT, District Judge.

The plaintiff is a corporation organized and existing under the laws of the State of Arizona, with its principal place of business at Phoenix, Arizona, and is authorized to do business in Oklahoma as a foreign corporation. The defendant Taxi-Cab Drivers Local Union No. 889 is an unincorporated association, having its principal place of business at Oklahoma City, Oklahoma, and affiliated with the International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers of America, acting under a charter issued by that organization, and the defendants not specifically named in the above caption are officers and members of said organization.

The plaintiff leased its taxicabs and space in the building at the corner of California and Santa Fe streets in Oklahoma City, for offices, garage and storage space, from the G. C. Harrell Equipment Company. The G. C. Harrell Equipment Company, while it owned the building, and owned and leased to the plaintiff the taxicabs operated by the plaintiff, had no interest in the plaintiff's business other than to receive its rentals on the taxicabs and on the space and other equipment rented to said plaintiff.

The drivers of the taxicabs were all members of the defendant union.

On January 17, 1940, the same status existed between the plaintiff and the defendants as on August 23, 1940. The plaintiff company was duly licensed by the city of Oklahoma City to operate its taxicabs in said city and on the date of January 17, 1940, the plaintiff, in connection with the operation of its cab business, was operating the garage, storage and baggage business, and in connection with the operation of its cab, garage, storage and baggage businesses, it employed cab drivers, switchboard operators, dispatchers, starters and checkers, cashiers, baggage truck drivers and helpers, automobile and truck washers and greasers, and porters in and around its garage. It carried on and conducted its business primarily from the building housing its garage, cabs, baggage and other equipment, located as above stated, and throughout the years had established and maintained well-known and recognized Yellow taxicab, garage, storage and baggage businesses, was known to the traveling public of Oklahoma City, throughout the state of Oklahoma and adjoining states, and had a good will in the established businesses.

On the 17th of January, 1940, the plaintiff entered into a written contract with the defendant union with reference to the operation of its cab business, running for a term of two years. The contract provided among other things for a closed shop and it was agreed that the plaintiff recognize the union as the exclusive bargaining agency for the drivers of all taxicabs owned by said operator and it further agreed to hire only members who were in good standing of Local Union No. 889, except as thereinafter provided.

It furthermore provided that the plaintiff could employ men who were not members of the local union but that such men so employed should make application to the secretary thereof for a permit entitling them to drive taxicabs in Oklahoma City for a period of ten days from the date of their employment and if the

men so driving should prove satisfactory to the plaintiff and their past record should show that they were satisfactory to the labor union, said persons could make application to join the union and, after passing a physical examination, should thereafter be entitled to membership in said union. At the end of the ten-day period, the said driver should either join the union or quit driving the taxicab.

It contained a paragraph with reference to the relationship between the drivers and the dispatchers and how grievances of all character with the dispatchers should be handled. It provided that "at no time shall any driver be permitted to go into the dispatcher's office."

It provided also that the plaintiff should and would keep the taxicabs in good mechanical condition at all times and that it would furnish tire service to all of its cabs wherever and whenever needed.

It provided a wage scale, drivers' hours, time off each week for the drivers, and other details with reference to the operation of said taxicabs.

At the time of the execution of said contract the drivers were all out on strike and the contract included the following paragraph: "It is further understood and agreed that the driver members of the Union while driving cabs of the Operator shall not be required to run and/or drive through a picket line, and no driver member of said Union shall be discriminated against, or otherwise penalized for upholding Union principles. * * *"

The contract provided for seniority, a merit system and leaves of absence under certain conditions. It also provided that the plaintiff should have the right and power to discharge any driver for cause but that any man so discharged should have the right of appeal to a board of arbitration, if his said cause is approved by the grievance committee within a period of time not to exceed forty-eight hours from the date of said discharge, and provided the procedure by said board of arbitration and for payment of time lost under certain conditions.

The contract provided also as follows: "It is further understood and agreed by and between the parties hereto that this contract shall be binding upon both of the parties hereto for a period of two (2) years from the effective date of same.

"Thirty (30) days prior to the expiration of this contract, either party shall have the right to suggest changes for the ensuing year. If changes are suggested by the Union, their suggestions shall be served upon the Operator, in writing, at least thirty (30) days prior to the expiration of this contract, and if the Operator suggests changes, it shall likewise serve notice of its demands, in writing, upon the Union thirty (30) days prior to the expiration of the contract.

"If either party serves notice of changes to be demanded, then the opposite party shall have the right to submit counter-proposals, in writing, which shall be done ten (10) days after receiving notice of the original changes proposed.

"If changes are proposed and counter-proposals made, the Operator and the Union shall attempt by negotiations and conciliation to settle and dispose of their differences, and in the event they should be unable to agree, the proposals, and/or counter-proposals may, with consent of the Operator and the Union, be thereupon submitted to arbitration. The arbitration board shall be brought about in the same manner as hereinbefore referred to.

"If no changes, proposals or counter-proposals are suggested, this contract shall remain in full force and effect for another period of two (2) years from date of expiration."

For a year prior to January 17, 1940, the plaintiff was operating its cab business under a closed shop with said union, the name of the union then being Teamsters, Chauffeurs, Stablemen and Helpers Local Union No. 889.

In the early part of August, 1940, the employees of said plaintiff engaged as switchboard operators, dispatchers, starters and checkers, baggage truck drivers and helpers, automobile and truck washers and greasers, porters, and cashiers were non-union so far as known to the plaintiff. On the 18th of August, 1940, defendant D. A. Baldwin, as the business agent of said defendant union, called upon G. C. Harrell in his office in the same building in which the offices of the plaintiff company were located and its business conducted, and advised Harrell that a majority of the employees of the plaintiff, above described, other than the taxicab drivers, had affiliated with the defendant union and presented to the said Harrell a proposed

contract in which the plaintiff recognized the union as the collective bargaining agency for all cashiers, switchboard operators, dispatchers, starters and checkers, baggage truck drivers and helpers, automobile and truck washers and greasers, and porters coming within and under the jurisdiction of the International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers of America. It also provided that the adjustment of wages, hours of labor, and other modifications and practices should be negotiated within thirty days of the effective date of this contract.

Harrell advised Baldwin that he could not act on the matter; that he was merely the adviser for the plaintiff company; that he was not an officer, director or stockholder in said company; that his only interest· in the company was to receive the sums due him for the leased trucks and the leased space and equipment in the building; but that he would, if requested by the plaintiff, give the matter consideration.

On Wednesday, August 20, Baldwin again came to see Harrell and left with him a contract, to be executed immediately, which fixed the compensation of all employees of said plaintiff other than the taxicab drivers. On the 21st day of August, Baldwin returned and discussed the matter with Harrell and Harrell advised him that he had gone over the matter with the auditor, that the plaintiff company was now operating at a loss of $400 per month, and that to comply with the terms of this contract would result in an additional loss of at least $500 per month. On Saturday, August 23, at approximately five-thirty in the afternoon, Baldwin returned to the office of Harrell and advised him that unless this contract were signed immediately, the drivers would be called off their cars and a picket line would be thrown around the building.

Baldwin immediately thereafter went into the office of the dispatcher and gave the dispatcher instructions to notify all taxi drivers not to take out any cars after six o'clock and further told the dispatcher not to receive or to deliver calls after that hour. The taxicabs were brought into the garage, immediately after six o'clock and no cabs went out after that time.

At six o'clock said building was picketed, the pickets wearing a banner both in front and in back with the inscription "Yellow Cab Company Unfair to Teamsters Helpers of Taxi Cab Drivers Local 889" printed in black type except the word "unfair" which was in large red letters and the name of the union, "Local 889", in smaller red letters. The picket line has been and is now being maintained around said building.

At this time the plaintiff had a contract with the Oklahoma Biltmore Hotel Company by which it handled all the hotel company's baggage business, transferring it from the hotel to the stations and from the stations to the hotel. It also had a contract with the Wells-Roberts Hotel to store and service the cars of guests at the hotel.

Immediately after this picket line was formed, defendant Baldwin called the proprietor of the Biltmore Hotel and told him that the plaintiff company was unfair to organized labor and, unless the hotel ceased doing business with the plaintiff, he would see that the hotel was picketed as being unfair to organized labor. Baldwin also called the proprietor of the Wells-Roberts Hotel and told him that, unless the hotel ceased doing business with the plaintiff company, the hotel would be picketed by the defendant union.

The business· of the plaintiff was at a standstill and on or about the 1st of September, 1940, the plaintiff sold its taxicab business to the Y & Y Taxicab Company of Oklahoma City, and the G. C. Harrell Equipment Company, at the same time, sold the cabs outright to the Y & Y Company.

The Biltmore Hotel ceased doing business with the plaintiff company and immediately after the 1st of September, it transferred its business to the Y & Y Company.

The plaintiff, after its sale to the Y & Y Company, had nothing left except its storage business and the garage in which it rendered service to the cars stored .from the Wells-Roberts Hotel and an occasional car stored by the general public. It also operated a small gasoline plant which had been used for the servicing of the taxicabs and the accommodation of an occasional outside customer.

After the sale of the plaintiff's business to the Y & Y Company, Baldwin again called on the Wells-Roberts Hotel manager and advised him that he understood he was still doing business with the plaintiff and unless he discontinue such busi-

ness and also sign a contract with the defendant union covering the employees of the hotel, the Wells-Roberts Hotel would be picketed. The manager of the Wells-Roberts Hotel testified that, in order to protect the hotel and because of the threat made by Baldwin, he withdrew the business from the plaintiff.

Immediately following the filing of this suit, the pickets changed their banners to read "This Garage Unfair to Helpers Div. of the Taxi Cab Drivers Local 889", printed in heavy red letters.

When the strike was called and the picket line formed, all of the employees of the plaintiff, who were reported to have joined the union, left their posts of duty and went out on the strike; no one was discharged by the plaintiff.

At the time this suit was filed, a colored boy, James Criss, was the only striker who had not been employed by the Y & Y Company. The evidence disclosed that the present picketing is being continued solely on account of this colored porter, who was employed first by the plaintiff company early in August, 1940, who made application to join the union on the 16th of August, who went out on strike on the 23rd of August, and who, while he may not be considered exactly "the negro in the woodpile", is the "fly in the ointment."

Criss testified that the plaintiff, since the strike was called, had offered him employment from time to time, but that he had refused such employment unless the plaintiff would execute the contract with the local union, which was presented on August 22nd.

The plaintiff, in its complaint, charges that the acts of the defendant union and the members thereof were malicious and were for the sole purpose of destroying the business of this plaintiff; and it seeks damages from the defendants because of the slander and libel contained in the publication of untrue statements with reference to the plaintiff.

The third cause of action asks for an injunction against the defendants and each of them from further maintaining the picketing and also from disbursing any of the moneys now in the hands of said local union, until the determination of the issues in this action.

The application for an injunction was heard in open court. Two days were spent in the introduction of evidence, both on behalf of the plaintiff and the defendants, and one day in argument by counsel. There is little or no contention that the facts in the case are not as stated herein, there being very little contradiction by the defendants of the evidence introduced by the plaintiff.

The president of the plaintiff company testified that he had no knowledge of any intended strike nor of the conditions of the contract which the union expected him to sign until the afternoon the strike was called.

He further testified that all of the help involved in this action were apparently satisfied with their wages and hours and all the conditions of their employment; that no complaint of any nature or character had ever been made to the officers of the plaintiff company relative to these matters; that when he was advised that a majority of the miscellaneous help desired to join the union, he raised no objection, but he did make a check of his employees to see how many of them desired to join the union and all were advised that he had no objection to their affiliation with the union; and, that no complaint was made by Baldwin, the business manager of the union, to the officers of the plaintiff company that the wages and hours were not satisfactory until he presented the proposed contract for execution by the officers of the plaintiff company and arbitrarily demanded that they sign it or a strike would be called of the taxicab drivers, as well as all other help.

The strike of the taxicab drivers was called before the picket line was formed because at approximately five-thirty on the afternoon of August 23rd, Baldwin, with what authority is not apparent, went into the dispatcher's office and arbitrarily gave instructions to the dispatcher to notify all taxicab drivers not to receive any further calls but to bring in their cabs. The picket line was formed at six o'clock and taxicab drivers were in the picket line.

It is clear that any participation in the strike by the taxicab drivers was in violation of the contract of January 17, 1940, for while under the terms of the contract they might be justified in not crossing a picket line, it is hardly reasonable to conclude that under the terms of the contract they would have the right to form a picket line themselves and then refuse to operate the cabs because it would necessitate

their crossing the picket line. From the 23rd of August until the 1st of September the taxicabs were idle.

In order to settle the whole matter and to avoid further trouble with the union, the president of the plaintiff company testified that his company agreed to and did sell the entire business connected with the taxicab company to a competitor company.

After the plaintiff company sold its business to the Y & Y Company, the Wells-Roberts Hotel, which had ceased doing business with the plaintiff after it was notified shortly after August 23rd, believing that all matters had been adjusted between the plaintiff and the union, resumed its business of storing customers' cars in the plaintiff's garage.

It is admitted that the jurisdiction of this court is based soley on the ground of diversity of citizenship and that all of the business which the plaintiff did at the time the strike was called was strictly intrastate and was regulated by the laws of the state of Oklahoma.

It is the judgment of this court that, if any labor dispute existed between the plaintiff and the union, that dispute disappeared upon the transfer of this business by the plaintiff to the Y & Y Company and that a labor dispute could not exist and did not exist by the mere fact this colored boy was kept on the picket line instead of being given employment by the Y & Y Company.

As stated above, when the president of the plaintiff company, after the sale of the plaintiff's business, learned the colored boy was still out of employment, he offered him employment in his garage and the colored boy testified that he did not accept the employment because he was afraid the union would not approve and that he was advised by the union not to accept such employment unless the plaintiff signed the contract with the union.

The plaintiff contends that the question, as to whether or not a labor dispute existed in this case, must be determined by the laws of Oklahoma. The defendants contend that the Norris-LaGuardia Act is controlling and that the question must be determined by the provisions of that act.

In Senn v. Tile Layers Protective Union Local No. 5, 301 U.S. 468, 57 S.Ct. 857, 81 L.Ed. 1229, this very question was passed upon by the Supreme Court of the United States. The case originated in the state of Wisconsin and the Supreme Court of Wisconsin had held that under the laws of that state there was a labor dispute. The United States Supreme Court held that the labor act of the state of Wisconsin was valid and that the decision of the Supreme Court of Wisconsin was binding upon the Supreme Court of the United States.

In a later case, Lauf v. E. G. Shinner & Co., 303 U.S. 323, 58 S.Ct. 578, 82 L.Ed. 872, the Supreme Court again passed upon this question. This case was also from Wisconsin. The second, third and fifth paragraphs of the syllabus in said opinion, Law Edition, are as follows:

"2. The law of the state in which the acts complained of occurred governs the substantive rights of the parties to a suit in a Federal court for injunctive relief.

"3. While the substantive rights of the parties are governed by the laws of the state in which the acts complained of occurred, the power of a Federal District Court to grant the relief prayed in a suit to enjoin picketing by members of a labor union depends upon the jurisdiction conferred upon it by the statutes of the United States. * * *

"5. Federal courts are bound by a construction put upon a state statute by the highest court of the state."

The serious question in this case is with reference to the jurisdiction of this court to grant an injunction.

Under the Norris-LaGuardia Act, 29 U.S.C.A. § 101, it is provided: "No court of the United States, as defined in this chapter, shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this chapter; nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in this chapter."

Under section 102 of the above act, the public policy is declared and defined as follows: "Whereas under prevailing economic conditions, developed with the aid of governmental authority for owners of property to organize in the corporate and other forms of ownership association, the individual unorganized worker is commonly helpless to exercise actual liberty

of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment, wherefore, though he should be free to decline to associate with his fellows, it is necessary that he have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection; therefore, the following definitions of, and limitations upon, the jurisdiction and authority of the courts of the United States are hereby enacted."

Section 103:

"Any undertaking or promise, such as is described in this section, or any other undertaking or promise in conflict with the public policy declared in section 102 of this chapter, is hereby declared to be contrary to the public policy of the United States, shall not be enforceable in any court of the United States and shall not afford any basis for the granting of legal or equitable relief by any such court, including specifically the following:

"Every undertaking or promise hereafter made, whether written or oral, express or implied, constituting or contained in any contract or agreement of hiring or employment between any individual, firm, company, association, or corporation, and any employee or prospective employee of the same, whereby

"(a) Either party to such contract or agreement undertakes or promises not to join, become, or remain a member of any labor organization or of any employer organization; or

"(b) Either party to such contract or agreement undertakes or promises that he will withdraw from an employment relation in the event that he joins, becomes, or remains a member of any labor organization or of any employer organization."

It is apparent, therefore, that nothing in the conduct of the plaintiff in this case was contrary or in violation of the public policy announced in said act. There is no evidence that the colored boy was ever advised either directly or indirectly that he should not join the union or that he could not continue in the employment of the plaintiff if he joined the union.

The record discloses that the plaintiff did not know whether these miscellaneous employees were members of the union or not and never made any inquiry as to the number who had joined the union, until the question came up either on the day of or a few days before the strike.

Section 104 of the act provides the conditions under which a court may not issue an injunction, as follows:

"No court · of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following acts:

"(a) Ceasing or refusing to perform any work or to remain in any relation of employment;

"(b) Becoming or remaining a member of any labor organization or of any employer organization, regardless of any such undertaking or promise as is described in section 103 of this chapter;

"(c) Paying or giving to, or withholding from, any person participating or interested in such labor dispute, any strike or unemployment benefits or insurance, or other moneys or things of value;

"(d) By all lawful means aiding any person participating or interested in any labor dispute who is being proceeded against in, or is prosecuting, any action or suit in any court of the United States or of any State;

"(e) Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence;

"(f) Assembling peaceably to act or to organize to act in promotion of their interests in a labor dispute;

"(g) Advising or notifying any person of an intention to do any of the acts heretofore specified;

"(h) Agreeing with other persons to do or not to do any of the acts heretofore specified; and

"(i) Advising, urging, or otherwise causing or inducing without fraud or violence the acts heretofore specified, re-

gardless of any such undertaking or promise as is described in section 103 of this chapter."

From the evidence in this case no injunction or restraining order is sought to enjoin any of the acts set forth under section 104.

Section 107 provides the conditions under which an injunction may be issued, as follows:

"(a)   That unlawful acts have been threatened and will be committed unless restrained or have been committed and will be continued unless restrained, but no injunction or temporary restraining order shall be issued on account of any threat or unlawful act excepting against the person or persons, association, or organization making the threat or committing the unlawful act or actually authorizing or ratifying the same after actual knowledge thereof;

"(b)   That substantial and irreparable injury to complainant's property will follow;

"(c)   That as to each item of relief granted greater injury will be inflicted upon complainant by the denial of relief than will be inflicted upon defendants by the granting of relief;

"(d)   That complainant has no adequate remedy at law; and

"(e)   That the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection."

The evidence discloses that the banners carried by the strikers advertised to the world that the plaintiff company was unfair to organized labor, and that statements were made by Baldwin, the business agent of the union, to both of the hotels advising them that the plaintiff was unfair to organized labor and that the hotels themselves would be picketed if they continued to do business with the plaintiff company.   In view of the fact that there is not one word of evidence in this entire record which justifies the statement that plaintiff was unfair to organized labor, such a threat constituted an unlawful act such as is referred to under subdivision (a) of section 107, supra.

The record also supports the contention of the plaintiff that substantial and irreparable injury to the plaintiff's property would follow since the right to do business is a property right and it is certain that under subdivision (c) no injury or damage of any character would result to the union by the granting of the injunction whereby a serious loss of business would result to the plaintiff unless an injunction be granted.

It is apparent, also, from the record that the plaintiff has no adequate remedy at law as the defendants have testified they have no property, not exempt from execution under the laws of Oklahoma, and the union itself has only a small amount of money on deposit in the bank for use in connection with its local business.

As to subdivision (e), the picket lines were formed on the public streets of Oklahoma City in plain view of the police force.   It was well-known that said strike existed, not only by the city authorities but by the county authorities, and no effort was made by said authorities to stop the strike, and such authority would not have been exercised until it were shown that the banners carried by the pickets contained statements which were untrue and which were damaging to the plaintiff.

As stated hereinbefore, a full and complete hearing was had in this case and at the time this suit was filed the only basis claimed by the union for a labor dispute was the fact that this colored porter, who had been employed by the plaintiff company for only about two weeks and who joined the union a week before the strike and who left the employ of the plaintiff without any cause, remains on strike.

The purpose of the Act of Congress was not to deprive the courts of their inherent jurisdiction nor the right to issue an injunction where facts and circumstances justify injunctive relief in order to protect property rights.   The purpose of the law was to protect labor in the exercise of its rights as defined by the laws of the land.

The union in this case demanded a closed shop and on January 17, 1940, it entered into a binding contract with the plaintiff, disregarding the fact that there were some twelve or fourteen miscellaneous employees around the garage and offices of the plaintiff company, who were not members of the union.   The union had an opportunity then to insist that all employees connected with the business be members of the union.   It waived that

right and in effect approved the plan of the plaintiff in continuing these non-union men in its employ.

It was strongly contended by the plaintiff that the calling of the strike on the 23rd of August was for the purpose of driving the plaintiff out of business. In order to meet the objections of the union, it agreed to and did sell its entire taxi-cab business to a unionized competitor and it did this in the belief that that would settle all matters with the union, and the fact this colored porter was not taken into the employ of the Y & Y Company, when it took over the taxicab business of the plaintiff, but was continued as a picket, supports the contention of the plaintiff that the union still sought to drive it out of business.

The court, therefore, is of the opinion, as stated above, that at least after the 1st of September, 1940, the date of the sale of the taxicab business by the plaintiff company, under the laws of Oklahoma there was not only no labor dispute but there was no basis for a labor dispute and that the union's act in maintaining this colored boy out of employment and on picket duty, being compensated for his time by the union, was such an arbitrary act and so plainly evidenced malice and a desire to injure the plaintiff in its business and property rights that it does not rise to the dignity of a labor dispute, as that term is defined by the statute.

■ Collective bargaining involves the right of members of an organization, either through a committee or representative, to confer with the employer, and to present their claims or grievances as to hours, wages, and general conditions incident to their employment, with the end in view of arriving at a reasonable and amicable adjustment of such matters.

■ The fact that Baldwin presented a demand for increased wages and other concessions, and Harrell advised him that the plaintiff was operating at a loss and to grant Baldwin's demands would entail an additional loss of at least $500 per month, does not justify the defendants' contention that plaintiff refused to bargain with defendants.

■ Collective bargaining does not mean that a refusal to meet the demands of the bargaining agent, based upon facts and sound business judgment, is a refusal to bargain. The term bargain implies a mutual exchange of ideas, reasons, and grounds for approving or disapproving submitted propositions.

An employer has the right to object to a proposition for increased wages for his employees, if the proposed schedule of wages is beyond his financial ability to pay.

■ Organized labor should be fully protected in every right which it possesses under the laws of this land but the Constitution should not be strained in order to give a union relief under such questionable circumstances as are disclosed by this record. A non-union employee has the same right to protect his family and earn a livelihood as if he were a member of a union and his right, privilege and opportunity of joining a union or refusing to join a union should be protected as any other right which he possesses.

The plaintiff is engaged in a legitimate business and it has rights which are entitled to the protection of this court, and certainly destruction of its business under the guise of a so-called labor dispute, which upon its face is without merit, should not have the approval of any court of justice.

It was agreed by and between the parties, at the time of this hearing, that this hearing should be considered as an application for a permanent injunction.

■ The court, therefore, is of the opinion that the picketing, by carrying banners containing untrue statements which are damaging to the plaintiff, was unjustifiable and should be restrained. The court is not of the opinion that the defendants should be enjoined from spending any sum of money in the possession of the union for the reason that the sum so shown to be in the possession of the union was not in excess of the amount necessary for its usual and ordinary operations.

A permanent injunction may issue as otherwise prayed for, upon the execution by the plaintiff of a surety bond in the sum of $1,000.

Findings of fact and conclusions of law have been made and are herewith filed with the clerk of this court. A form of judgment providing for the issuance of the permanent injunction, as outlined in this opinion, may be submitted within five days of this date.